IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

JOHNSON ELECTRIC NORTH
AMERICA, INC.,                    :

          Plaintiff,           Case No. 3:19-cv-146

    v.                                :

HONEYWELL INTERNATIONAL,          JUDGE WALTER H. RICE
INC.,                             :

          Defendant.

---

DECISION AND ENTRY OVERRULING PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AS TO LIABILITY ON ITS BREACH OF CONTRACT CLAIM (DOC.
#129); OVERRULING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO
COUNTS II AND IV OF DEFENDANT'S COUNTERCLAIM (DOC. #132); AND
OVERRULING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC.
#135).

---

Plaintiff, Johnson Electric North America, Inc. ("Plaintiff" or "Johnson

Electric"), has filed an Amended Complaint ("Complaint") against Honeywell

International, Inc., ("Defendant" or "Honeywell"), alleging a breach of contract

between the parties. Doc. #51.[1] In response, Honeywell has filed a counterclaim,

Doc. #18, contending that Honeywell is entitled to specific performance of the two

agreements at issue or, in the alternative, alleging that Plaintiff has breached its

contracts with Defendant.

---

[1] Throughout these filings, both parties refer to themselves as "Plaintiff," "Defendant," "Counter-
Plaintiff" and "Counter-Defendant." *See, e.g.*, Docs. #129, 132, 142, 143. For clarity purposes, the
Court will refer to both parties as designated in the case caption.

This matter is before the Court pursuant to three Motions for Summary Judgment. First, Plaintiff has filed its First Motion for Summary Judgment as to Liability on its Breach of Contract Claim, Doc. #129. In this Motion, Plaintiff argues that no genuine issue of material fact exists to dispute that the "Amended Agreement" between the parties is a valid and enforceable contract, that Honeywell breached that agreement, and that Johnson Electric is entitled to judgment as a matter of law. Doc. #129, PageID#6323. In support, Plaintiff relies on its accompanying memorandum, several supporting exhibits and deposition testimony. Defendant filed its Response, Doc. #144, and Plaintiff has filed its Reply, Doc. #146.

Plaintiff has also filed its Second Motion for Summary Judgment on Counts II and IV of Defendant's Counterclaim, Doc. #132. In this Motion, Plaintiff contends that no genuine issue of material fact exists to dispute that "Honeywell committed the first material breach of the parties' LTA ("Long Term Agreement"), and that Honeywell was responsible for the delays in development and testing of Johnson Electric's Alpha 4 chassis." Doc. #132, PageID#7454. Plaintiff again relies on its accompanying memorandum, supporting exhibits and deposition testimony. Defendant has filed its Response, Doc. #143, and Plaintiff has filed its Reply, Doc. #147.

Finally, Defendant has filed its own Motion for Summary Judgment, Doc. #135. Defendant contends that no genuine issue of material fact exists between the parties and that Defendant is entitled to judgment as a matter of law on

2

Plaintiff's claim for breach of contract, Count I, as well as Defendant's Counterclaims for breach of contract, Count IV. Doc. #135, PageID#9391. Defendant relies on its accompanying memorandum, declarations of employees, deposition testimony and the pleadings in this litigation. *See id.* Plaintiff has filed its Response, Doc. #142, and Defendant has filed its Reply, Doc. #148.

These Motions have been fully briefed by the parties and are ripe for adjudication by the Court.

## I. **Background**

Plaintiff "is a Connecticut corporation with its principal place of business [in] Vandalia, Ohio." Doc. #1, PageID#2. Plaintiff specializes in "motion products, control systems and flexible interconnects" and "serves a broad range of industries" including automotive, defense, aerospace, home technologies, and HVAC services. *Id.* Plaintiff also "provides application specific disconnect relays . . . and switches for residential energy meters." *Id.*

Defendant "manufactures and sells electricity meters to customers . . . who depend on Honeywell's meters to safely and reliably provide electricity services to their residential and commercial customers." Doc. #135, PageID#9402 (citing Doc. #135-1, PageID#9443. One aspect of Honeywell's business is a "remote disconnect switch, sometimes referred to as a 'relay,' which allows the remote switching of electrical service to a residence or business on and off." *Id.*

### A. The Strategic Supplier Agreement

On April 1, 2016, Johnson Electric and Honeywell entered into a Strategic Supplier Agreement, also referred to as a Long-Term Agreement ("LTA"). Doc. #1, PageID#3; *see also* Doc. #1-2, PageID#15 (signed Strategic Supplier Agreement). As part of this agreement, Johnson Electric began supplying its "Tri-Blade" switch to Honeywell for use in its "Rex" line of meters. Doc. #1, PageID#3; Doc. #107, PageID#2730. The LTA became effective on April 1, 2016, and was to remain in effect until December 31, 2019, unless terminated through the mechanisms provided in the agreement. Doc. #1-2, PageID#15. This agreement "[did] not specify a quantity of Products to be purchased by Honeywell, [did] not obligate Honeywell to purchase any Products, and [was] not an exclusive purchasing agreement." Doc. #1-2, PageID#15.

The LTA established the pricing for the Tri-Blade relays throughout the length of the agreement. *See* Doc. #1-2, PageID#35 ("Exhibit A" of LTA). The LTA also stated that "[t]he above pricing of Johnson Electric Switches integrated with Honeywell negotiated components will adjust with negotiated pricing between any outside parties. Such fluctuations will be passed on to Honeywell upon inventory depletion. The pricing for Honeywell negotiated items will be reviewed on a monthly basis." *Id.* Further, any other changes in price would be based on a "mutual agreement" and would be provided "as an amendment" to the LTA. *Id.* at PageID#36. Honeywell reserved the right to "terminate this Agreement for convenience upon 60 days' prior written notice" and to "terminate any Purchase

Order without liability on the part of Honeywell upon 30 days' prior written notice." *Id.* at PageID#15. Further, the LTA "may not be modified, extended, canceled or rescinded except in a writing signed by the parties which expressly references this Agreement." *Id.* at PageID#32.

Additionally, The LTA stated that any requested purchases by Honeywell should be submitted to Johnson Electric in a purchase order ("PO") and that these POs would be subject to the terms of the LTA. *Id.* at PageID#16. These POs would be "deemed immediately accepted and binding" on Johnson Electric "unless it requires delivery of Products in less than the Lead Time" as defined in the LTA. *Id.* The LTA also contained provisions that would ensure that Honeywell could continue to supply its products without interruption in the future. *See, e.g., Id.* at PageID#22 ("[Johnson Electric] will maintain an on-time delivery performance of 99% to agreed locations and times."); *Id.* at PageID#16 ("At Honeywell's request, [Johnson Electric] will provide for a period up to six months after termination or expiration of this Agreement . . . to allow the manufacture of the Products to continue without interruption or adverse effect and to facilitate the order transfer of the manufacture of the Products.").

**B. The Alpha 4 Program**

In late 2016, Honeywell and Johnson Electric began discussing a new "next-generation" project, which was referred to interchangeably as the CMP ("Common Meter Platform"), Alpha 4 or Entergy Program. Doc. #130-1,

5

PageID#6927.[2] This new meter was designed to be utilized in residential,
commercial and industrial settings. Doc. #110, PageID#3281. Additionally, the
product was to have an "integrated meter base," which meant that "the switch
[was] integrated into the chassis of the meter." Doc. #111, PageID#3737. This
design would optimally result in a lower overall cost for Honeywell. *Id.*

Concurrently, Honeywell entered into a separate agreement with Entergy, a
"significant new customer," to supply certain meters to Entergy, including the
Alpha 4 Meter. Doc. #135-1, PageID##9443-44. As part of this agreement,
Honeywell was required to deliver the Alpha 4 Meter by the end of 2018 and to
begin field installation by January 2019. *Id.* at PageID#9599. Johnson Electric was
aware of the deadline established between Honeywell and Entergy. *See, e.g.*,
Doc. #119-17, PageID#4841 (Johnson Electric internal documentation
acknowledging January 2019 field deployment date).

In March 2017, Honeywell conducted an e-auction for the supply of the
switch for the Alpha 4 Program. *See* Doc. #130-1, PageID#6927; *see also* Doc.
#135-3, PageID#9646.[3] Several bidders were involved in the auction, including KG
Technologies, Falco, and Johnson Electric. Doc. #104, PageID#2425. During the e-
auction, Johnson Electric placed a bid for "100% of the relay volumes." Doc.

---

[2] For ease of reference, the Court will use the term "Alpha 4" designation throughout this decision.

[3] The switch, along with the "flying lead" and the base, made up the "chassis assembly" of the Alpha 4 Meter. Doc. #135-3, PageID#9646.

6

#130-1, PageID#6927. As the conclusion, Honeywell selected Johnson Electric to be a "preferred supplier" on the Alpha 4 Program. Doc. #135-3, PageID#9647.

### C. The Conditional Award Agreement

On April 1, 2017, Honeywell and Johnson Electric entered into a Conditional Award Agreement ("CAA") which governed the Alpha 4 Program. *See generally* Doc. #124-10.[4] This agreement also incorporated the terms of the original LTA between Johnson Electric and Honeywell. Doc. #124-10, PageID#5858. As part of the agreement, Johnson Electric agreed to pay Honeywell $400,000 up front as "quick savings," to support "the research, development, and design of the new program." *Id.* at PageID#5860; *see also* Doc. #130-1, PageID#6927. Honeywell, in turn, agreed to pay $750,000 to Johnson Electric for tooling. *Id.* at PageID#5861. This agreement would remain in effect until December 31, 2023. Doc. #124-10, PageID#5858.

As part of the CAA, Johnson Electric agreed to "participate with Honeywell on regular . . . technical reviews during the development of the program and institute corrective actions to eliminate barriers." *Id.* at PageID#5860. Johnson Electric also agreed to "deliver Prototypes" and to "maintain an on-time delivery performance of 100%." *Id.*

The CAA also stipulated that any purchases by Honeywell were subject to the needs of Honeywell's customers:

---

[4] Both parties have cited to the CAA in separate exhibits. *Compare* Doc. #124-10 *with* Doc. #Doc.114-3. For efficiency purposes, the court will only reference to Doc. #124-10 throughout this decision.

> Honeywell makes this conditional award to Supplier subject to the establishment of Product Pricing per program, and Supplier's agreement with the terms set forth herein. Honeywell may not have received customer award for some or all of the Goods in this conditional award. The Goods and/or the Program may also be subject to delay or cancellation. This conditional award is subject to customer's award of the Program for the Goods to Honeywell and Supplier's compliance with all the provisions set forth below. Failure of the customer to award the Program and/or Goods to Honeywell or any delay, cancellation, or change to forecasted volume of the Program and/or Goods by customer shall be without liability to Honeywell.

*Id.* Further, "[t]his Agreement does not specify a quantity of Products to be purchased by Honeywell, does not obligate Honeywell to purchase any Products, and it not an exclusive purchasing agreement." *Id.* The CAA also stated that any volume forecasts were subject to change and "[were] based upon Honeywell's customer's forecasted requirements." *Id.* at PageID#5859. Moreover, the CAA contained a "Limitation of Liability" Clause, which stipulated that:

> Honeywell is not liable for any special, indirect, incidental, consequential, exemplary, or punitive damages (including any damages from business interruption, loss of profits or revenue, cost of capital, or loss of use of any property or capital) even if advised, or otherwise, aware, of the possibility of any such damages. The exclusion of such damages is independent of, and will survive, any failure of the essential purpose of limited remedy under these terms and conditions.

*Id.* at PageID#5873.

### D. The Alpha 4 Meter Design Change and Alternate Switch Suppliers

Both parties collaborated on the development of the Alpha 4 Program. *See* Doc. #100, PageID#1933; Doc. #111, PageID#3378; Doc. #123-6, PageID#5626 ("Entergy CMP Program Team" Organizational Chart). The original design of the

8

Alpha 4 Meter included an "integrated base" design. Doc. #102, PageID##2198-99; Doc. #100, PageID#1933. However, in October 2017, Honeywell called for a redesign to the integrated meter base, focusing instead on an "interchangeable" design. *See* Doc. 106, PageID#2621; Doc. #100, PageID##1946-47. This design change required Johnson Electric to assemble the chassis before sending the product to Honeywell. *See* Doc. #112, PageID#3520; *see also* Doc. #106, PageID#2631.

Moreover, this redesign would allow Honeywell to source relays from other sources. *See* Doc. #107, PageID##2743-44; Doc. #112, PageID## 3500-01; Doc. #115-13, PageID#4186. As part of this redesign, Honeywell began receiving quotes from secondary suppliers. *See, e.g.*, Doc. 123-9; Doc. #123-11; Doc. #125-22; Doc. #125-24. At the same time, Honeywell still considered Johnson Electric the "prime supplier" for the Alpha 4 Program. Doc. #130-2, PageID#6964.

Around this time, Honeywell also began seeking a price reduction on both the Alpha 4 Program and the original Tri-Blade switches. Doc. #104, PageID#2444; *see also* Doc. #125-25, PageID#5994 ("I need you to push JE on cost reduction of current Tri-Blade switch and path to lower cost for [the Alpha 4 Program]."). In return for requested cost reductions, Honeywell strongly contemplated awarding the Entergy business to Johnson Electric. *See* Doc. #125-25, PageID#5994 (email stating "[i[f they do this, I say we award them the Entergy Business" and "[i]f JE comes back with this – we should move forward . . .").

9

### E. The Amended Agreement and Subsequent Negotiations

In early 2018, Johnson Electric and Honeywell began negotiations to amend the LTA. *See* Doc. #107, PageID#2770-71; Doc. #104, PageID#2445. Dirk Weiss ("Weiss"), Vice President of Technology Solutions, and Larry Sciancalepore ("Sciancalepore"), Senior Account Manager, led discussions for Johnson Electric. Doc. #112, PageID#3486; Doc. #130-1, PageID##6925-26. Ron Malin ("Malin"), Director of Strategic Sourcing, led discussions for Honeywell. Doc. #104, PageID#2417. On March 2, 2018, Malin emailed Weiss, stating that Honeywell would "move forward with JE" based off a previous conversation between Malin, Weiss and another Honeywell employee. Doc. #128-13, PageID#6292. This email contained pricing quotes for both the Alpha 4 Program and the Tri-Blade switch. *Id.*

On March 12, 2018, Malin sent a follow-up email to Weiss, containing an attachment entitled "Amendment to Exhibit A – Products, Minimum Stocking Level, Pricing, Lead-times and Specifications." Doc.128-14; Doc. #128-15. According to this initial draft, "pricing on the current Tri-Blade Product and the new A4-Residentiall 2S Disconnect Chassis ([the Alpha 4 Program])" would change based upon ratification of the amendment. Doc. #128-15, PageID#6296. Specifically, this draft allotted a "[m]inimum 75% share on the Entergy Program." and stated that "Johnson Electric understands that Honeywell will need to qualify two sources, [because] 100% cannot be guaranteed." *Id.* This amendment also

10

sought to extend the duration of the original LTA through 2021. *Id.* Moreover, the draft contained the updated pricing per unit between the parties. *Id.*

After additional negotiations between the parties, Malin sent an email to Weiss on March 16, 2018, which stated "[p]lease see discussed changes." Doc. #127-5, PageID#6140. The email did not contain any other language: no signature block, no valediction and no company letterhead or logo. *See generally* Doc. #127-5. The email did, however, contain an attachment, which was the revised draft of the Amendment. *See* Doc. #127-6, PageID#6141. The revised draft, in explanation of the potential pricing changes to the LTA, contained the following language:

- Minimum 80% share on the Entergy Program. Johnson Electric understands that Honeywell will need to qualify two sources, 100% cannot be guaranteed. Honeywell may order 100% from Johnson Electric but cannot guarantee the 100%.
- LTA for Tri-Blade will be extended thru [sic] 2023 and include the transition from Tri-Blade to Alpha4 product. Pricing will need to be added on LTA for years 2020 to 2023.

Doc. #127-6, PageID#6141. This draft, as did the previous draft, contained several tables with updated pricing. *Id.* This draft was not signed by either party. *See* Doc. 116-4, PageID#4213; Doc. #112, PageID#3514; Doc. #104, PageID#2446-47.

On March 19, 2018, two emails were sent by Sciancalepore. First, an internal email was sent between Sciancalepore and Weiss, discussing potential revisions to the March 16 draft amendment. *See* Doc. #116-9, PageID#4224. Second, an email from Sciancalepore was sent to Robert Rodriguez, an employee of Honeywell. Doc. #128-17, PageID#6303. This email stated that "Johnson

11

Electric and Honeywell have come to a new pricing agreement which affects the three Tri-Blade relays." *Id.* The email also stipulated that these new prices were effective April 1, which reflect the same prices outlined in the draft amendment. *Compare id. with* Doc. #127-6, PageID#6141 (noting the same prices in the column labeled "April 1, 2018 thru [sic] September, 30 2018")[5].

On April 3, 2018, Weiss sent an email to Malin with a subject line of "Honeywell A4 Quotation – April 2018.doc." Doc. #135-3, PageID#9650. Attached to the email was a revised version of the quote. *See* Doc. 135-3, PageID##9652-56. The email also requested Malin to review the document in preparation for an official quote. *See id.* at PageID#9650 ("If this document is fine for you I will ask Larry [Sciancalepore] to make it as an official quote."). This "officially approved" quote was processed through the "JE approval system" and, on April 16, 2018, the quote was emailed by Sciancalepore to Malin. Doc. #116-17, PageID#4258. This revised quote mirrored the pricing agreement but included a "Notes" section to expound upon the official quote. Doc. #116-18, PageID#4262-63; *see also* Doc. #107, PageID#2767. Malin responded that he "did not see all the additions" that Honeywell put into the quote and that he "would like to discuss [the quote]". Doc. 116-19, PageID#4262. This version of the quote was never signed by Honeywell. Doc. #107, PageID#2769.

---

[5] Although the court is aware that "September, 30 2018" is an improper date, this is the verbatim language from the draft of the amendment.

12

Discussions continued between Johnson Electric and Honeywell, centered on the updated pricing provided by Johnson Electric. *See* Doc. #128-19, PageID#6309 (language from a quotation package "which outlines the pricing structure for the [Alpha 4 Program], as well as an amended pricing structure for the existing Tri-Blade relay."); Doc. #107, PageID#2763 (Sciancalepore stating that Johnson Electric was "making updated versions" of the amendment); Doc. #112, PageID#3524. The parties also began negotiating other terms in the LTA, including the termination rights of the parties. *See, e.g.*, Doc. #127-10, PageID##6163-66; Doc. #116-20, PageID##4272-74 (internal Johnson Electric documentation discussing removal of Honeywell termination clause). These discussed changes were never reduced to a signed agreement by either party. Doc. #107, PageID#2771.

**F. The Testing of the Alpha 4 Switch Fails**

On April 16, 2018, Honeywell provided a preliminary drawing of the Alpha 4 Switch, identifying certain Honeywell specifications. Doc. #135-4, PageID#9658. A formal drawing of the Alpha 4 Switch was sent in August 2018, again identifying certain Honeywell specifications. *Id.* These specifications were based on industry standards "ANSI C12.1 and NEMA C12.30." Doc. #122-1, PageID#5263.[6] These

---

[6] In a footnote on Doc. #122-1, PageID#5263, the report states that "very similar versions of the temporary overcurrent test could be found in these locations:
- ANSI C12.1-2014 – American National Standard for Electric Meters – Code for Electricity Metering, Test No. 20: Effect of temporary overloads.
- NEMA C12.30 TR-2013, Test Requirements for: Metering Devices Equipped with Service Switches, Section 5.19 Through Fault Test

specifications required that no switches could fail 12kA testing. Doc. #135-2,

PageID##9606, 9641. Further, Johnson Electric was to, at its own cost, "take such

actions as are necessary to maintain/obtain such listing/certification at all times."

Doc. #1-2, PageID#20, 24-25; Doc. #124-10, PageID##5867-68. This included

becoming "UL listed." *See* Doc. #112, PageID#3542; *see also* Doc. #122-1,

PageID#5267.[7] UL certification largely encompasses the tests that Honeywell had

required in its specifications. *See* Doc. #122-1, PageID#5267.

　　During this testing period, Honeywell began issuing POs to Johnson Electric

for delivery of the Alpha 4 Chassis in October 2018. *E.g.*, Doc. 116-25,

PageID#4298 (Honeywell PO with a delivery date of October 25, 2018). At the

same time, the Alpha 4 Switch was failing 12kA Testing. *See* Doc. #102,

PageID#2213; *see also* Doc. #117-5, PageID#4331 ("The 12kA Overcurrent tests on

the 4x Entergy samples A3.1, A3.2, A4.1 & A4.2 have been completed, but the

results are not good . . . a quick review suggested that 3 FAILED and 1 was a

marginal PASS."). Johnson Electric reported these "sobering" results to

Honeywell in October 2018. Doc. #106, PageID#2648; Doc. #118-14,

PageID##4724-25 (email discussing a 100% fail rate on 12kA testing). These

failures prompted several rounds of redesign and testing, with a hope of

improving the 12kA test rates. *See* Doc. #102, PageID##2216-17; *see also* Doc.

---

[7] "Listing is a very common certification given to a product after it has gone through testing by a nationally recognized testing laboratory (NRTL) such as Underwriters Laboratories (UL)." Doc. #122-1, PageID#5267. Underwriters Laboratories have listed, on its website, several advantages to having a product certified. *Id.* (citing https://www.ul.com/services/certification/product-certification (last visited May 20, 2022)).

#118-13, PageID#4698 (Johnson Electric internal update showing results of various 12kA testing).

The repeated failures continued into November 2018 and were "substantially worse than expected," including instances when the meter caught fire during testing. Doc. #120-11, PageID#4989; Doc. #135-2, PageID#9607; Doc. #120-7, PageID#4888. These poor test results led Johnson Electric to recommend that "production of their switch be postponed until more analysis and potentially design improvements can be implemented on their switch." Doc. #102, PageID#2220; *see also* Doc. #118-13, PageID#4698.

Due to the repeated failures, Honeywell informed Johnson Electric that they would not accept the current version of the Alpha 4 switch. Doc. #120-9, PageID#4899. Finally, in January 2019, Johnson Electric conducted additional 12kA testing and reported that the testing resulted in zero failures. Doc. #102, PageID##2218, 2226. Although Johnson Electric reported zero failures, Johnson Electric did not obtain ANSI certification or UL listing for the Alpha 4 Switch. Doc. #111, PageID#3426; *see* Doc. #112, PageID#3548.

### G. Honeywell Searches for An Alternate Supplier and Entergy Demands a New Design

In response to the ongoing failures, Honeywell began searching for a secondary supplier to expedite an acceptable switch. *See* Doc. #108, PageID#2897; Doc. #127-24, PageID#6232. Honeywell eventually placed Falco on the "critical path" toward an acceptable switch. Doc. #101, PageID#2092. Falco

was able to quickly produce an alternate switch, which was subsequently approved for use by Entergy. *See* Doc. #101, PageID#2093; Doc. #110, PageID#3298.[8] The expedited qualification of a switch resulted in additional expenses to Honeywell. *See* Doc. #108, PageID#2915; Doc. #128-9, PageID#6279; *see generally* Doc. #135-5.[9]

After Entergy approved this new design, it communicated to Honeywell that it preferred the new design and requested that all Alpha 4 Meters utilize the 2CT design. Doc. 135-1, PageID#9444. Further, Entergy, in an effort to ensure that the 2CT design was used, stated that, if necessary, it would purchase less meters from Honeywell. *Id.* Honeywell relayed this request to Johnson Electric. Doc. #112, PageID#3552. Johnson Electric, however, did not provide a 2CT version of the switch. Doc. #102, PageID#2205. As a result, Entergy placed no orders with Honeywell for the 1CT switch that Johnson Electric had available. Doc. #135-1, PageID#9445.

### H. A Second E-Auction is Conducted for the Alpha 4 Switch

In February 2019, Weiss, on behalf of Johnson Electric, reached out to Malin, wanting to discuss the current position of both parties. *See* Doc. #120-4,

---

[8] The Falco version of the Alpha 4 Switch was a "2CT" version of the switch. *See* Doc. 108, PageID#2913. This version was different than the Johnson Electric version, which was a "1CT" version. *Id.* The distinction refers to the number of coils utilized in the design. *See, e.g.*, Doc. #135, PageID#9417 (discussing distinction in design).

[9] Separate from their initial estimates of expenses, Honeywell, in its Motion for Summary Judgment, Doc. #135, states that Johnson Electric's actions also triggered the liquidated damages clause. *See* Doc. #135, PageID#9417 (citing the Conditional Agreement, Doc. #114-3, PageID#3757).

PageID#4880.  In this email, Weiss stated his position that "[t]he spirit of the contract, if not the terms," awarded Johnson Electric "the full Entergy business." *Id*.  Weiss stated that Johnson Electric took several actions to obtain the anticipated market share, including the payment of "quick cash" at the onset, discounts on the Tri-Blade program, and investing "big engineering resources and capital in assets." *Id.*  Johnson Electric also discussed the price point that they would be willing to consider at this stage in the project. *Id.*

However, in March 2019, Honeywell conducted a second e-auction for the Alpha 4 Switch.  Doc. #108, PageID#2907.  Before this e-auction occurred, Johnson Electric was given the opportunity to price match compared to other suppliers, who were offering units at $0.53 lower cost per unit.  *See* Doc. #112, PageID##3547, 3555.  Johnson Electric never matched the price of the cost per unit.  *Id*.  Johnson Electric did, however, participate in the March 2019 e-auction.  Doc. #107, PageID#2790.  At the conclusion of the e-auction, Honeywell offered Johnson Electric approximately twenty to thirty percent of the Alpha 4 Chassis business.  *Id.*  After the e-auction, Johnson Electric immediately ceased supplying Honeywell with the Tri-Blade switch.  Doc. #101, PageID#2114.

### I. Both Parties Allege Breach of Contract Claims

On May 10, 2019, Honeywell sent Johnson Electric formal notice that it had breached the LTA and demanded assurance of performance.  Doc. #120-5, PageID##4884-85.  On May 14, 2019, Johnson Electric sent a notice of breach of contract to Honeywell, stating that it breached the CAA.  Doc. #124-12,

17

PageID#5884. Further, Johnson Electric stated that, due to Honeywell's conduct, it was "suspending further performance" under the agreements between the parties. *Id.* at PageID#5885. Eventually, the parties agreed to an "interim measure" in which Honeywell made a payment of approximately $619,000 in return for the release of Tri-Blade switches by Johnson Electric. *See* Doc. #124-13, PageID#5890. This measure did not, however, waive any applicable claims by either party. *Id.* at PageID#5889-90.

## II. Standard of Review

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party always bears the initial responsibility of informing the court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323; *see also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir. 1991).

"Once the moving party has met its initial burden, the nonmoving party must present evidence that creates a genuine issue of material fact making it necessary to resolve the difference at trial." *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Once the burden of production has so shifted, the party opposing

18

summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324. "The plaintiff must present more than a scintilla of evidence in support of his position; the evidence must be such that a jury could reasonably find for the plaintiff." *Michigan Prot. & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 341 (6th Cir. 1994).

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine dispute of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in favor of that party. *Id.* at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe; credibility determinations must be left to the fact-finder. 10A Wright, Miller & Kane, *Federal Practice and Procedure* § 2726 (3d ed. 1998).

In determining whether a genuine dispute of material fact exists, a court need only consider the materials cited by the parties. Fed. R. Civ. P. 56(c)(3). "A

district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). If it so chooses, however, a court may consider other materials in the record. Fed. R. Civ. P. 56(c)(3).

The standard of review for cross-motions of summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation. *Taft Broad. Co. v. United States,* 929 F.2d 240, 248 (6th Cir.1991). "The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other; summary judgment in favor of either party is not proper if disputes remain as to material facts. Rather, the court must evaluate each party's motion on its own merits." *Id.* (citations omitted).

### III. Analysis

The language of the LTA states that "[t]his Agreement is governed by and interpreted in accordance with the laws of the State of New York, without regard to conflict of laws provisions, and without regard to the provisions of the United Nations Convention on the International Sale of Goods." Doc. #1-2, PageID#33, ¶ 24.3.

To establish a breach of contract under New York law, a plaintiff must establish "(1) the existence of a contract, (2) the plaintiff's performance pursuant to the contract, (3) the defendant's breach of its contractual obligations, and (4)

20

damages resulting from the breach." *Arnell Constr. Corp. v. New York City Sch. Constr. Auth.*, 144 A.D.3d 714, 716, 41 N.Y.S.3d 101 (N.Y. App. Div. 2016). Further, under New York law, "the plaintiff must demonstrate that he performed under the contract." *Vision Entm't Worldwide, LLC v. Mary Jane Prods.*, Case No. 13 Civ. 4215, 2014 U.S. Dist. LEXIS 154099, at *28 (S.D.N.Y. Oct. 17, 2014) (citing *Beautiful Jewellers Private Ltd. v. Tiffany & Co.*, 438 Fed. Appx. 20, 21-22 (2d Cir. 2011)). "[A] party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach." *Martell Strategic Funding LLC v. Am. Hospitality Acad.*, Case No. 12-CV-627 (VSB), 2019 U.S. Dist. LEXIS 24288, at *23 (S.D.N.Y. Feb. 14, 2019). "A breach is material if it 'go[es] to the root of the agreement between the parties [and] is so substantial that it defeats the object of the parties in making the contract." *Id.* (citing *Frank Felix Assocs., Ltd. v. Austin Drugs, Inc.*, 111 F.3d 284, 289 (2d Cir. 1997)).

New York courts will regularly enforce contract terms that dictate how an agreement may be amended. *United Mobile Techs., LLC v. Pegaso PCS*, 509 F. App'x 48, 50-51 (2d Cir. 2013) ("Under New York contract law, it is well established that even if the parties have agreed upon all the terms of a proposed contract, if they do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until the written instrument is executed."). In New York, if the parties conclude a contract requiring that any modification thereof be in writing and signed by the parties, in the absence of such a writing, any alleged

21

oral modification to the time of the essence provision, in light of the contractual proscription against oral modification contained in the parties' written agreements, is barred by the statute of frauds. *No. 1 Funding Ctr., Inc. v. H & G Operating Corp.*, 48 A.D.3d 908, 910, 853 N.Y.S.2d 178, 181 (2008).

### A. Plaintiff's Claim for Breach of the Draft Agreement

In its First Motion for Summary Judgment, Johnson Electric alleges that "Honeywell entered into and then breached the Amended Agreement." Doc. #129, PageID#6335. Johnson Electric further alleges that "Honeywell failed to perform its obligations under the Amended Agreement – contrary to Honeywell's agreement to award Johnson Electric an 80% share of the Entergy program, it held a second e-auction and awarded Johnson Electric 0%, thereby breaching the Amended Agreement." *Id.* at PageID#6336. As part of its analysis, Johnson Electric discusses several potential arguments of Honeywell and attempts to establish that such arguments are without merit. *See id.* at PageID##6341-46.

In response, Honeywell states that Johnson Electric cannot establish any element of a breach of contract and that said failure is fatal to Johnson Electric's claim. *See* Doc. #135, PageID#9422. In its filings, Honeywell alleges that Johnson Electric materially breached the agreement first and, therefore, excuses performance by Honeywell. *See* Doc. #144, PageID##10522-26. Honeywell also contends that the discussed amendment is not an enforceable agreement. *See id.* at PageID##10526-10538. Lastly, Honeywell argues that, if the agreement was, in

fact, enforceable, Honeywell did not breach that agreement. *See id.* at
PageID##10538-39.

### 1. The Law of the Case Doctrine is Not Applicable for Purposes of Determining Whether Summary Judgment is Appropriate

Before examining whether the Amended Agreement constitutes a valid and
enforceable agreement, the Court will address Johnson Electric's contention that
the Court's prior decision, granting in part and denying in part Honeywell's
Motion to Dismiss, Doc. #23, warrants use of the law of the case doctrine in regard
to the application of the New York Electronic Signatures and Records Act
("ESRA") and the theory of partial performance and, therefore, establishes
contract formation in this instance. Doc. #142, PageID##10044-50. Honeywell
argues that law of the case is inapplicable in this instance, because the standard
for determining a motion to dismiss and a motion for summary judgment are
different. Doc. #148, PageID10654. The Court believes that law of the case
doctrine is inapplicable in this situation.

Under law of the case doctrine, "when a court decides upon a rule of law,
that decision should continue to govern the same issues in subsequent stages of
the same case." *Greene v. Ab Coaster Holdings, Inc.*, Case No. C2:10-cv-38, C2:10-
cv-234, 2010 U.S. Dist. LEXIS 91671, *5 (S.D. Ohio Aug. 5, 2010). At the same
time, "[a] decision on a motion to dismiss . . . does not establish the law of the
case for purposes of summary judgment." *Thompson v. Transam Trucking, Inc.*,
Case No. 2:08-cv-927, 2011 U.S. Dist. LEXIS 61176, *15 (S.D. Ohio June 8, 2011);

*see also Hagan v. Baird (In re B & P Baird Holdings, Inc.)*, 759 Fed. Appx. 468, 477-78 (6th Cir. 2019) (citing *Wilkins v. Jakeway*, 44 Fed. Appx. 724, 727-28 (6th Cir. 2002)) ("We have held that the law of the case doctrine does not apply to earlier proceedings where a different legal standard governs.").

Since the Sixth Circuit has directly held that a decision on a motion to dismiss does not establish the law of the case for purposes of summary judgment, this Court finds that Johnson Electric cannot rely on the law of the case doctrine, standing alone, to support its claims under the ESRA or for partial performance.

### 2. Valid and Enforceable Agreement?

To establish the existence of a valid and enforceable agreement, "a plaintiff must establish an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound." *Kasowitz, Benson, Torres & Friedman, LLP v. Duane Reade*, 98 A.D.3d 403, 404, 950 N.Y.S.2d 8, 9 (N.Y. App. Div. 2012). An offer is "an objective manifestation of [a party's] intent to enter into a bargain, such that [the offeree] was justified in understanding that his assent to that bargain [was] invited and [would] conclude it." *Kolchins v. Evolution Mkts., Inc.*, 31 N.Y.3d 100, 107, 96 N.E.3d 784, 788 (N.Y. 2018). "Courts look to the basic elements of the offer and the acceptance to determine whether there [was] an objective meeting of the minds sufficient to give rise to a binding and enforceable contract. *Silber v. New York Life Ins. Co.*, 92 A.D.3d 436, 439 (N.Y. App. Div. 2012).

24

         a. Honeywell's Argument That Malin Did Not Possess
            Authority to Bind Honeywell to the Amended Agreement
            is Without Merit

Before addressing the elements of formation, Honeywell attempts to

dispose of the agreement by arguing that Malin did not have authority to bind

Honeywell in this situation. The Court disagrees. "An agent has 'the power . . . to

do an act or to conduct a transaction on account of the principal which, with

respect to the principal, he is privileged to do because of the principal's

manifestation to him.'" *Lisa Cooley, LLC v. The Native, S.A.*, Case No. 20-CV-5800

(VEC), 2021 U.S. Dist. LEXIS 42643, *7-8 (S.D.N.Y. Mar. 5, 2021) (quoting *Minksoftt*

*v. Am. Exp. Travel Related Servs. Co.*, 98 F.3d 703, 708 (2d Cir. 1996)). An agency

relationship can be established by apparent authority, which "arises from the

written or spoken words or any other conduct of the principal which, reasonably

interpreted, causes [a] third person to believe that the principal consents to have

[an] act done on his behalf by the person purporting to act for him." *Id.* at *8

(quoting *Minksoff*, 98 F.3d at 708)). Moreover, "[a] principal may also make a

manifestation [regarding agent's apparent authority] by placing an agent in a

defined position in an organization or by placing an agent in charge of a

transaction or situation." *Id.* (quoting Restatement (Third) of Agency § 3.03

(2006)); *see also First Fidelity Bank v. Gov't of Antigua*, 877 F.2d 189, 193 (2d Cir.

1989) ("The appointment of a person to a position with generally recognized

duties may create apparent authority."); *United States v. Inc. Vill. Of Island Park*,

888 F. Supp. 419, 437 (E.D.N.Y. 1995) ("Apparent authority is the authority which

outsiders would normally assume the agent to have, judging from his position with the corporation and the circumstances of his conduct.").

Ron Malin served as Director of Strategic Sourcing for Honeywell. *See* Doc. #104, PageID#2417. Malin also testified that part of his duties included negotiating with suppliers. *See Id.* (testifying that "[m]y role as a strategic sourcing person was to negotiate with suppliers" and "I was not responsible for purchase orders, I was responsible for negotiating pricing."). Malin oversaw discussions about the amended agreement with Johnson Electric. *See id.* Further, Malin testified in his deposition that he had spoken about this draft agreement with Dirk Weiss and Jeff Lucy and believed that all three of them "were basically aligned" on the major points of the agreement. *Id.* at PageID#2454. Based upon the testimony of the parties, Malin's conduct and his title, the Court believes that, at a minimum, it was reasonable for Johnson Electric to rely on Malin's authority to negotiate the formation of the contract.[10] Therefore, the Court finds this argument without merit. At the very least, a genuine issue of material fact exists on this issue, thus, precluding summary judgment.

---

[10] The Court notes Honeywell's argument that Malin informed Johnson Electric that he did not have "signature authority" over this agreement. *See* Doc. #144, PageID##10530-31. Even if, *arguendo*, Malin did not have signature authority, it does not, in the Court's opinion, preclude him from having the authority to negotiate the deal and to submit an offer to Johnson Electric in this situation.

b.  The March 16, 2018, Email Was a Valid Offer Between
Honeywell and Johnson Electric

The Court believes that the March 16, 2018 email constitutes an offer from

Honeywell to Johnson Electric.  The email was sent from Malin, an employee of

Honeywell, to Weiss, an employee of Johnson Electric.  Doc. #127-5, PageID#6140.

Both parties, along with Sciancalepore, were part of the negotiation process.  Doc.

#112, PageID#3486; Doc. #130-1, PageID##6925-26.  The body of the email states

"please see discussed changes."  Doc. #127-5, PageID#6140.  The attached

document, the CAA, states that "[p]er the discussions between Johnson Electric

and Honeywell between February 8, 2018, and March 8, 2018, pricing on the

current Tri-Blade Product and the new Alpha4-Residential 2S Disconnect Chassis

[] will change based upon the following agreement . . ."  Doc. #127-6,

PageID#6141.  This document is on Honeywell letterhead.  *Id.*  Further, the

document mirrors the exhibit found within the LTA.  *Compare id. with* Doc. #1-2,

PageID#35.

c.  A Genuine Issue of Material Fact Exists Regarding
Whether Johnson Electric "Unequivocally" accepted
Honeywell's Offer on March 19, 2018.

Johnson Electric argues that it "unequivocally" accepted Honeywell's offer

through an email, dispatched on March 19, 2018.  *See* Doc. #129, PageID#6338.

This email was sent by Sciancalepore to Roberto Rodriguez, an employee of

Honeywell.  Doc. #128-17, PageID#6303.  This email stated that "Johnson Electric

and Honeywell have come to a new pricing agreement which affects the three Tri-

27

Blade relays." *Id.* The prices outlined in the email are the same prices outlined in the draft amendment. *Compare id. with* Doc. #127-6, PageID#614.

On April 3, 2018, however, Weiss sent an email to Malin with a revised version of the quote. *See* Doc. #135-3, PageID##9650, 9652-56. The email also requested Malin to review the document in preparation for an official quote. *See id.* at PageID#9650 ("If this document is fine for you I will ask Larry [Sciancalepore] to make it as an official quote."). Further, this version of the quote was processed through the "JE approval system" and was emailed by Sciancalepore to Malin on April 16, 2018. Doc. #116-17, PageID#4258. This revised quote included a "Notes" section to further discuss the official quote. Doc. #116-18, PageID#4262-63; *see also* Doc. #107, PageID#2767. Malin responded to the email that he "did not see all the additions" that Honeywell put into the quote and that he "would like to discuss [the quote]." Doc. 116-19, PageID#4262.

Based on the record, the Court believes that there is genuine issue of material fact as to whether Johnson Electric "unequivocally" accepted Honeywell's offer by its conduct on March 19, 2018, or, in the alternative, whether Johnson Electric and Honeywell continued to negotiate, as evidenced by the April 3, 2018, email from Sciancalepore to Malin. Since a genuine issue of material fact still exists on this issue, summary judgment is inappropriate in this instance.

> d. A Genuine Issue of Material Fact Exists as to Whether the ESRA Applies in this Instance.

Johnson Electric contends that the email exchanges between itself and Honeywell meet the requirements of the New York Electronic Signatures and Records Act ("ESRA") and, thus, support its contention that the Amended Agreement is valid and enforceable. *See* Doc. #142, PageID##10046-50. Honeywell contends that the ESRA is inapplicable in this instance and does not support Johnson Electric's argument. *See* Doc. #135, PageID##9423-27.

New York's ESRA, 9 NYCRR § 540, was "intended to support and encourage electronic commerce and electronic government by allowing people to use electronic signatures and electronic records in lieu of handwritten signatures and paper documents." 2002 N.Y. ALS 314. Under the ESRA, "[t]he use of an electronic signature as defined in ESRA shall have the same validity and effect as the use of a signature affixed by hand." 9 NYCRR § 540.4(a). Further, "[i]n accordance with ESRA, an electronic signature is an electronic sound, symbol, or process, attached to or logically associated with an electronic record and executed or adopted by a person with the intent to sign the record." 9 NYCRR § 540.4(b).

Further, under New York law, e-mail messages can constitute a "signed writing," which will satisfy both the statute of frauds as well as the underlying agreement's requirement that modifications are to be signed by the parties. *See e.g.*, *Ion Audio, LLC v. Bed, Bath & Beyond, Inc.*, Case No.15-CV-8292 (KMW), 2019 U.S. Dist. LEXIS 58913 (S.D.N.Y Apr. 2, 2019) (stating that an exchange of emails,

discussing a modification of terms, was controlling in light of a provision in the contract requiring modifications to be reduced to writing and signed by the parties.).

Here, it is unclear whether the parties, pursuant to the ESRA, have "signed" the Amended Agreement. Johnson Electric argues that Malin's email, which included a draft of the Amended Agreement, was sent to Johnson Electric and, further, that Johnson Electric "unequivocally accepted" when Sciancalepore sent an email, with a signature block, to both Malin and Honeywell's distributor stating that there was a new pricing agreement. *See* Doc. #142, PageID#10048; Doc. #128-17, PageID#6303. Johnson Electric also states that Honeywell sent POs that state that the parties "have come to a new pricing agreement." *See* Doc. #142, PageID#10048; *see also* Doc. #130-3, PageID#7063 (Honeywell P.O. with stated language). Johnson Electric believes that these facts, when considered together, constitute a signature under the ESRA and, therefore, creates a valid and enforceable agreement.

However, the body of the email sent to Johnson Electric states "please see *discussed changes.*" Doc. #127-5 PageID#6140. It contained no signature, no valediction (no statement ending the document, such as "sincerely"), and no company letterhead or logo. *See generally* Doc. #127-5. At the same time, and as discussed previously, Johnson Electric forwarded an email to Honeywell, on April 3, 2018, with a revised version of the same quote. *See* Doc. #135-3, PageID##9650, 9652-56. This email also requested Malin to review this in

30

preparation for an official quote. *See id.* at PageID#9650 ("If this document is fine for you I will ask Larry [Scianacalepore] to make it as an official quote."). After this quote was processed through the Johnson Electric "approval system," it was sent again to Malin on April 16, 2018. Doc. #116-17, PageID#4258.

The Court, after careful consideration, believes that there is a genuine issue of material fact as to whether the emails exchanged on or around March 16, 2018, should constitute a valid signature, under the ESRA, or if the subsequent emails continued to discuss and modify the terms of the agreement. As such, there is a genuine issue of fact as to whether the ESRA would bind the parties.

> e. The Doctrine of Partial Performance Does Not Permit Enforcement of the Amended Agreement Because the Tri-Blade Pricing Reductions Do Not "Unequivocally Refer" to the Amended Agreement

New York's UCC § 2-209(2) states that "[a] signed agreement which excludes modification or rescission except by a signed writing cannot be otherwise modified or rescinded, but except as between merchants[;] such a requirement on a form supplied by the merchant must be separately signed by the other party." Under New York law, partial performance is an exception to the requirement of a written modification, so long as the performance is "unequivocally referrable to the oral modification." *Rose v. SPA Realty Assocs.*, 42 N.Y.2d 338, 343-44 (N.Y. 1977).

This performance "must be such as will admit of not other possible explanation except one pointing directly to the existence of the [] agreement

claimed." *D.A. Elia Constr. Corp. v. United States Fid. & Guar. Co.*, Case no. 94-CV-0190E(h), 1997 U.S. Dist. LEXIS 5610, *15-16 (W.D.N.Y. Apr. 16, 1997); *see also Bioenergy Life Science, Inc. v. RiboCor, Inc.*, Case No. 650602/2014, 2018 N.Y. Misc. LEXIS 3092, *18 (Sup. Ct. July 16, 2018) (citing *Carlin v. Jemal*, 68 A.D.3d 655, 656 (N.Y. App. Div. 2009)) ([C]ompeting explanations do not raise a material question of fact because, so long as there is any plausible explanation other than the alleged oral agreement, *Rose* precludes the purported oral agreement from overcoming the contact's (sic) express prohibition on unsigned written amendments."); *Gootee v. Gob. Credit Servs., LLC*, 139 A.D.3d 551, 558 (N.Y. App. Div. 2016) (internal citations omitted) ("In other words, 'the actions must be unintelligible or at least extraordinary, explainable only with reference to the oral agreement.").

Throughout its discourse, Johnson Electric has focused on the partial performance of Honeywell to establish that the Amended Agreement is enforceable. *See e.g.*, Doc. #142, PageID##10050-52. Specifically, Johnson Electric argues that "Honeywell immediately took advantage of the Tri-Blade price reductions by issuing updated Tri-Blade POs consistent with Amended Agreement pricing." Doc. #142, PageID#10050. Further, the face of these POs stated that the parties "have come to a new pricing agreement." *See e.g.*, Doc. #130-3, PageID#7063.

Honeywell counters, stating that the prices discussed in the March 19, 2018, email from Sciancalepore can be attributed to an email discourse between Malin

32

and Weiss on March 2, 2018. Doc. #148, PageID#10663; Doc. #128-13,

PageID#6292. In that email, Malin states that "[Honeywell] will move forward with

JE based upon what you spoke to Jeff and I with." Doc. #128-13, PageID#6292.

That email lists the Tri-Blade price at $14.11. *Id.* This same figure is listed in the

email exchange between Honeywell and Johnson Electric on March 19, 2018. *See*

Doc. #128-17, PageID#6302. Further, Honeywell contends that Johnson Electric

"had multiple obligations pursuant to the Supplier Agreement to reduce Tri-Blade

Switch pricing . . . including 'lowest prices' and price matching reductions." Doc.

#148, PageID#10662; *see also* Doc. #1-2, PageID##20-21 (outlining several price

reduction provisions in the original LTA agreement).

Since Honeywell has argued that there is a "plausible explanation other

than the [Amended Agreement,] Johnson Electric cannot establish, under New

York law, that partial performance supports enforcement of the Amended

Agreement.

### B. Honeywell's Counterclaims Against Johnson Electric

Honeywell argues across its filings that it is entitled to summary judgment

on both of its counterclaims against Johnson Electric. *See* Docs. ##135, 143, 148.

Johnson Electric asserts that it, not Honeywell, is entitled to summary judgment

on Honeywell's counterclaims, raising various arguments. *See* Docs. ##132, 142,

147. In its analysis, the Court will address each counterclaim separately.

33

### 1.    Claim for Breach of the CAA

Honeywell contends that it is entitled to summary judgment on Count IV,

alleging a breach of the CAA by Johnson Electric, because "Johnson Electric

failed to timely develop, produce or deliver Qualified Alpha 4 Switches to

Honeywell by the end of 2018 in material breach of the [CAA]." Doc. #135,

PageID#9438; *see also* Doc. #143, PageID##10327-44. In response, Johnson

Electric argues that the CAA does not require delivery of the Alpha 4 Switches on

a certain date. *See e.g.*, Doc. #132, PageID##7472-73. Johnson Electric also

argues that, given the delivery dates were certain, Honeywell's action continued

to push the dates and prevent Johnson Electric from fulfilling its obligations. *See*

*e.g.*, *id.* at PageID##7473-78. Lastly, Johnson Electric states that Honeywell's

argument is without merit because the LTA, as considered in the Amended

Agreement, not the CAA, governs the delivery of the Alpha 4 Switches. *See* Doc.

#147, PageID##10604-08.

### a. The CAA Does Not Require Delivery on a Certain Date

One of the issues here is whether Johnson Electric was ever informed of a

"hard" delivery date for the Alpha 4 Switch. The following language is found in

the CAA: "The target is commercial production parts [which] will be ready to ship

using production tooling from the Zacatecas, Mexico, facility on or before June

30, 2018." Doc. #124-10, PageID#5862. The start of production eventually shifted

to September 2018. *See* Doc. #112, PageID#3507. Honeywell argues that,

although the production start date may have shifted, the delivery date of January

34

2019 never did and, further, that Johnson Electric failed to deliver qualified Alpha 4 Switches by that date. *See* Doc. #143, PageID##10328-29.

Further, Honeywell argues that the conditions upon delivery, as outlined in the CAA, support its argument that Johnson Electric had a firm delivery date. *See id.* at PageID#10328, n.3. Specifically, the CAA states that Johnson Electric was to "participate with Honeywell on regular APQP technical reviews during the development of the program and institute corrective actions to eliminate barriers." Doc. #124-10, PageID#5860. The CAA also states that Johnson Electric was to "deliver Goods (as measured to Honeywell's requested delivery dates – OTTR" and that Johnson Electric should "continually strive for a goal of 100% on-time delivery." *Id.*

The Court does not agree with Honeywell that this language, coupled with the target date of June 30, 2018, created a hard date that Johnson Electric was required to meet. The Alpha 4 Switch was a New Product Initiative and, therefore, delays were expected. *See* Doc. #100, PageID#1989. Further, both parties agreed to move the expected start of production to September 2018, which directly contradicts the language in the CAA. *See* Doc. #112, PageID#3507. Most importantly, the CAA states that "[r]esolution of any Entergy or CMP product schedules, deliverables or liabilities will be defined in the extended LTA." Doc. #124-10, PageID#5860. As such, the court does not believe that the CAA, when considered alone, establishes a hard deadline that put Johnson Electric on notice.

b. Johnson Electric Was Aware of the January 2019
Delivery Date, But There is a Genuine Issue of Material
Fact as to Whether Johnson Electric Knew This Date was
a Firm Date.

Although the CAA does not contain a firm date for required delivery, the

Court notes that Johnson Electric was aware of those dates before they arrived.

For instance, internal notes from Johnson Electric include a start of production

date ("SOP") of September 2018 and, further, a deployment date of January 2019.

*See e.g.*, Doc. #120-9, PageID#4937; *see also* Doc. #143-1, PageID#10361 (Johnson

Electric email stating that "[f]irst delivery of meters to Entergy is January 1, but

Honeywell wants to have meters built well before that."). Moreover, internal

emails from Johnson Electric establish that they knew that penalties could be

placed on Honeywell if deadlines were not met. *See* Doc. #117-8, PageID#4532

("Petryus [Flaquer] stated if there is any delay in project, they would need to pay

Entergy USD 500k penalty, and can potentially loose (sic) contract.").

Although this evidence is enough to establish that Johnson Electric knew

about the anticipated January 2019 field installation goal, a genuine issue of

material fact exists as to whether this date was known to Johnson Electric as a

"firm" date. Weiss stated in his deposition that "[t]he production dates of

Honeywell definitely changed constantly through the whole program, especially

with all the interruptions which we have seen so far. Absolutely." Doc. #112,

PageID#3507. Weiss also stated he was unsure as to whether the January 2019

36

delivery date ever changed throughout the project. *See Id.* Marcus Herrmann

reiterated this in his deposition, stating:

> I cannot confirm if [January 2019] was the deadline. This was an
> information we got from Honeywell that Entergy wanted to deploy in
> January, but in all the project[s] that we have done with other
> customers dates change quite frequently, so I don't know what really
> happened here in that case.

Doc. #102, PageID#2195. As such, the Court believes that a genuine issue of

material fact exists as to whether Johnson Electric, based on the communications

cited by Honeywell and the contrasting deposition testimony of Johnson Electric

employees, knew that the January 2019 field deployment date was "firm" for

purposes of establishing a breach of the CAA.

### c. A Genuine Issue of Material Fact Exists Regarding the Impact of the Amended Agreement on the CAA

Honeywell also argues that Johnson Electric breached the CAA by failing to

deliver timely qualified products, pursuant to POs submitted by Honeywell.

Johnson Electric. *See* Doc. #143, PageID##10329-33. Johnson Electric argues that

the failure to meet any deadlines listed on the POs cannot constitute a breach of

the CAA, because the CAA was subsumed due to the formation of the Amended

Agreement and, therefore, the LTA supersedes the CAA. *See* Doc. #147,

PageID##10605-08. In the alternative, Johnson Electric argues that Honeywell's

conduct constituted a waiver of Johnson Electric's failure to timely deliver

pursuant to the POs that were submitted. *See id.* at PageID##10611-17

37

"Under New York law, a subsequent contract regarding the same subject matter supersedes the prior contract." *Private One of New York, LLC v. JMRL Sales & Serv., Inc.*, 471 F. Supp. 2d 216, 223 (E.D.N.Y. 2007) (citing *Independent Energy Corp. v. Trigen Energy Corp.*, 944 F.Supp. 1184, 1195 (S.D.N.Y. 1996)). "This is true even in the absence of an integration and merger clause, since prior agreements. . . . are deemed to merge and be subsumed in a later written agreement." *Id.* (internal citations omitted).

The CAA states that "[t]he parties agree to work together to amend exhibits of the Long-Term Agreement and to incorporate the agreed upon terms of this Conditional Award Agreement." Doc. #124-10, PageID#5858. Further, the Amended Agreement discusses the same subject matter: the production of the Alpha 4 Switch. *Compare id. with* Doc. #127-6, PageID#6141 (stating that "Johnson Electric will continue to support the design and development of a switch/chassis solution for the Entergy program" as well as discussing the market share of the Entergy program allocated to Johnson Electric). As such, it is unclear as to whether the Amended Agreement, under New York law, would be considered a subsequent agreement and, therefore, would subsume the CAA.

Since the Court determined earlier that a genuine issue of fact exists as to whether the parties entered into the Amended Agreement, the Court also concludes that a genuine issue of material fact exists as to whether enforcement of the Amended Agreement could, as argued by Johnson Electric, preclude any

claim of breach by Honeywell under the CAA. As such, summary judgment is not appropriate for either party at this time.

2. <u>Claim for Breach of the LTA</u>

Honeywell contends that it is entitled to summary judgment on Count II, alleging a breach of the LTA by Johnson Electric, because "Johnson Electric breached the [LTA] by delivering late and then unilaterally ceasing production and shipment of ordered Tri-Blade Switches, stating it would continue to refuse to deliver ordered Tri-Blade Switches unless Honeywell paid it over $4 million." Doc. #135, PageID#9437. Johnson Electric, in response, contends that its performance is excused because Honeywell committed the first breach, pursuant to the Amended Agreement, in failing to award Johnson Electric 80% of the Entergy market share. *See e.g.*, Doc. #132, PageID#7470.

Due to the previous determinations by the court, in this decision, summary judgment is not proper for either party on this claim. <u>First</u>, Johnson Electric's argument largely relies on the enforceability of the Amended Agreement, which Is, as discussed previously, a genuine issue of material fact in this case. *See* Section III(A)(1)(c), *infra*. <u>Second</u>, Honeywell's argument that Johnson Electric failed to "timely" deliver a qualified product hinges upon whether the dates given by Honeywell were understood to be firm delivery dates and, additionally, whether either party acquiesced to those dates. *See* Section III(B)(1)(b)-(c), *infra*.

39

As such, the Court feels that there are genuine issues of material fact that must be resolved and, therefore, declines to award summary judgment to either party at this time.

## IV. Conclusion

For the foregoing reasons, Plaintiff's Motion for Summary Judgment, Doc. #129, is OVERRULED. Plaintiff's Motion for Summary Judgment as to Count II and Count IV of Defendant's Counterclaim, Doc. #132, is OVERRULED. Defendant's Motion for Summary Judgment, Doc. #135, is OVERRULED.

Date: February 9, 2023

WALTER H. RICE
UNITED STATES DISTRICT JUDGE

40